UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Alice Gail Kneece, | ) | C/A No. 5:12-2637-TMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Carolyn W. Colvin,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). The issues before the court are whether the decision is supported by substantial evidence, and whether the Commissioner's decision contains an error of law. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I.  Relevant Background

  A.  Procedural History

Plaintiff applied for DIB and SSI in February 2009, Tr. 138-42, pursuant to Titles II and XVI of the Act, 42 U.S.C. §§ 401-403 and 380-83, *et seq.* Her applications were denied in initial

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W. Colvin for Michael J. Astrue as Defendant in this action.

and reconsidered determinations. Tr. 83-86. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 8-9, which was held on July 6, 2011. Tr. 28-66. In a decision dated August 10, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Tr. 13-23. The Appeals Council denied Plaintiff's request for review, Tr. 1-5, making the ALJ's decision the final decision of Defendant (the Commissioner) for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on September 13, 2012. ECF No. 1.

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was born in 1964 and was 42 years old on her alleged onset date. Tr. 22. She completed high school, and prior to her alleged onset date, Plaintiff worked as manager of a convenience store. Tr. 31, 35. Plaintiff alleged that she became unable to work in November 2006 when she suffered an on-the-job injury. Tr. 33.

#### 2. Relevant Medical History

##### a. 2007

Plaintiff was seen by Brett C. Gunter, M.D. of Columbia Neurosurgical Associates, P.A. on January 9, 2007. Tr. 302-03. Plaintiff complained of low-back pain with shooting pain to the right leg. Tr. 302. Plaintiff indicated she had an on-the-job injury on November 4, 2006, where she fell and landed on her back. *Id.* At the time of the injury Plaintiff was being treated for back pain. *Id.* Plaintiff had a previous discectomy in 2004. *Id.* Examination of Plaintiff's back indicated "[d]ecreased range of motion in cardinal planes." Tr. 303. Radiographic studies showed degenerative disk disease. *Id.*

Plaintiff returned to Dr. Gunter on February 6, 2007, complaining of worsening low-back pain and right leg pain. Tr. 301. Dr. Gunter's treatment plan included lumbar physical therapy with IDD,[2] and lumbar epidural steroid injection. *Id.* Plaintiff was instructed to remain out of work for six weeks. *Id.* In a March 27, 2007 follow-up appointment, Plaintiff presented with "a pain syndrome of 70% low back and 30% right hip and leg with recent failure of nonsurgical management including epidural steroid injections and long-term physical therapy." Tr. 300. Dr. Gunter offered Plaintiff a lumbar discogram of the lower three levels of the lumbar spine. *Id.* Plaintiff was instructed to remain out of work until after the discogram. *Id.* On May 7, 2007, Plaintiff indicated her pain had become progressively severe. Tr. 299. Dr. Gunter indicated the lumbar discogram at L5-L6 was positive, and indicated the need for an anterior lumbar interbody fusion at L5-L6. *Id.* On June 8, 2007, at Lexington Medical Center, Dr. Gunter and Dr. E. Myron Barwick performed an anterior lumbar interbody fusion of L5-6 on Plaintiff for discogenic lumbar back pain. Tr. 258-62. Plaintiff was discharged from the hospital on June 13, 2007, with a prescription for Lortab and instructions to follow-up with Drs. Gunter and Barwick. Tr. 256.

Plaintiff was seen by Dr. Gunter on July 3, 2007 for follow-up after the surgery. Tr. 298. Plaintiff had "increased radicular pain in her right leg and some numbness in her left anterior thigh." *Id.* Dr. Gunter prescribed Soma and Lortab and indicated the need for an MRI and possible CT of the lumbar spine. *Id.* On August 1, 2007, Dr. Gunter indicated the MRI did not demonstrate any evidence of compression at the surgery site, however he did assess "epidural fibrosis and lateral recess stenosis at the level above surgery." *Id.* On August 28, 2007, Dr.

---

[2] Intervertebral Differential Dynamics Therapy® is treatment for the relief of lower back pain. IDD Therapy is non-surgical, non-invasive, and typically does not involve pain medications. IDD Therapy can isolate each lumbar vertebra (L1, L2, L3, L4 or L5) and distract the vertebrae surrounding an injured disc 5 to 7 millimeters. The 25 to 30 minute treatment provides static, intermittent, and cycling forces on structures that may be causing low-back pain. *See* http://www.iddtherapy.com/english/what_is_idd.html (last visited Dec. 3, 2013).

Gunter assessed Plaintiff with "lumbar spinal stenosis that is symptomatic and intractable back pain." Tr. 296.  After discussing possible treatment options, Dr. Gunter agreed that lumbar spinal fusion and lumbar decompression "would be a worthwhile consideration." *Id.*  In an October 16, 2007 office visit note Dr. Gunter indicated Plaintiff underwent right L4-5 TLIF [transforaminal lumbar interbody fusion] on September 27, 2007. Tr. 295. Plaintiff stated she was "about 30% better overall but she [was] still taking four Lortab daily to control her pain." *Id.* Plaintiff returned on November 12, 2007, and stated she was "50% better overall in terms of her leg pain and 40% better overall in terms of her back pain." Tr. 294. Dr. Gunter prescribed Lortab 10 mg reduced to two per day, Soma on an as-needed basis, and lumbar physical therapy for six weeks. *Id.* When Plaintiff returned to Dr. Gunter on December 18, 2007, she reported that she was "about 70% better overall." Tr. 293.  Plaintiff reported some persistent back and leg pain. *Id.* Dr. Gunter indicated Plaintiff was to remain off work for four weeks, and that she would "likely be ready to return to light duty on her follow-up visit." *Id.* Dr. Gunter also indicated Plaintiff would have some permanent work restrictions including a lifting restriction of 25 pounds maximum. *Id.*

### b.  2008

At Plaintiff's March 4, 2008 follow-up with Dr. Gunter, Plaintiff reported back and occasional leg pain. Tr. 292.  The physical exam indicated her strength was intact in  her lower extremities, and Plaintiff moved with less difficulty. *Id.* Dr. Gunter's assessment was that Plaintiff was "making daily improvement." *Id.* He indicated Plaintiff was "about ready to undergo a Functional Capacity Evaluation ["FCE"] and work hardening program." *Id.*

Plaintiff went to Columbia Rehabilitation Clinic, Inc. on April 1, 2008 to begin physical therapy for low-back pain. Tr. 244. Plaintiff presented with pain, lack of range of motion, poor endurance, and lack of tolerance to prolonged positions. *Id.* In an evaluation of her low back

Plaintiff described the pain as radiating down her right leg, with numbness in her leg. Tr. 242. She noted that she wore a brace for prolonged driving, and sitting for 20 to 30 minutes increased her pain. *Id.* Progress notes throughout April 2008 recorded Plaintiff's efforts in physical therapy. Tr. 239-41. Progress notes dated April 28 and 30, 2008, indicate Plaintiff complained of low-back pain and a "gnawing" feeling in her legs. Tr. 238.

On May 8, 2008, physical therapist Tracy Hill of Columbia Rehabilitation Clinic, Inc., completed an FCE of Plaintiff. Tr. 225-234. Hill summarized the results of the FCE and indicated Plaintiff could "meet the demands of modified sedentary to modified light work." Tr. 225. Hill opined the following:

> She tolerates occasional walking, stairclimbing, kneeling, bending, and reaching. She does not tolerate occasional squatting, crawling, or twisting. She can lift from 6 to 15 pounds at various heights on an occasional basis. The lowest level lift she could complete was sixteen inches from floor level. She can carry 17 pounds with 2 hands. She can carry 6 pounds in the right hand and 6 pounds in the left hand. She can push 10 pounds loaded in a sled and can pull 10 pounds loaded in a sled. She has a self-reported sitting and static standing tolerance of 60 and 20 minutes respectively. She was observed to sit for a maximal time of 27 minutes and stand for a maximal time of 12 minutes. The patient's lumbar range of motion is limited. . . . The results of the treadmill test place [Plaintiff] in the poor Classification of Aerobic Capacity. [Plaintiff's] Functional Aerobic Capacity qualifies her for light work.

*Id.* A May 12, 2008 progress note indicated Plaintiff continued to have low-back pain.

Plaintiff was seen by Dr. Gunter on June 3, 2008, and noted continued "persistent back, hip and leg pain that is predominantly on the right." Tr. 291. Plaintiff indicated that although her pain was significantly better, the pain increased when she was more active. *Id.* Based on Plaintiff's FCE, Dr. Gunter assigned her a permanent restriction of light duty. *Id.* He noted that Plaintiff was at maximum medical improvement with a whole person rating of 35%. *Id.* Dr. Gunter released Plaintiff from his care, but noted she would need to see a pain-management specialist for evaluation and management of chronic pain. *Id.* On August 11, 2008, Dr. Gunter

converted Plaintiff's whole person impairment rating of 35% to a 47% impairment of the lumbar spine. Tr. 289.

At Dr. Gunter's request, Plaintiff consulted with Steven B. Storick of Carolina Spine Center on August 19, 2008, to discuss treatment for low-back and right-leg pain. Tr. 333-34. Dr. Storick continued Plaintiff on Lortab 10 mg three times daily, discontinued the Soma, continued the Valium, started Neurontin 300 mg at bedtime titrated to three times daily, and continued Plaintiff on Cymbalta. Tr. 334. Dr. Storick also suggested that Plaintiff try a selective nerve root injection at L5-S1 for the right leg symptoms. *Id.*

Plaintiff was seen on September 3, 2008, for follow-up and medication refill. Tr. 326. Plaintiff was assessed with acute onset swelling and pain of the right calf. *Id.* It was noted the swelling was unrelated to her previous injury, but a study was needed to rule of DVT [deep vein thrombosis]. *Id.* Plaintiff underwent a lumbar transforaminal epidural steroid injection on September 24, 2008. Tr. 324. In her follow-up appointment on October 8, 2008, Plaintiff reported she had a headache since October 2, 2008. Tr. 316. Plaintiff reported no relief from the recent injection. *Id.* Dr. Storick noted that because Plaintiff had not improved with conservative treatments, she may need to consider more aggressive options including a spinal cord stimulator. *Id.* Plaintiff returned for medication follow-up on October 29, 2008. Tr. 312. Plaintiff indicated the headache had resolved, but she continued to report low-back and right-leg pain. *Id.* Plaintiff's prescription for Neurontin was increased to 600 mg, and she was provided with samples of Cymbalta 30 mg to add to her 60 mg dosage. *Id.* Plaintiff returned for follow-up on November 19, 2008. Tr. 308. The treatment plan included continuation of her current medications, and evaluation with Dr. Clay Drummond for possible spinal cord stimulator. *Id.*

Clay Drummond, Ph.D. conducted an initial psychological evaluation of Plaintiff on December 20, 2008, to determine "the appropriateness of spinal column stimulation therapy." Tr. 346-48. Dr. Drummond opined that of "the three category screening methods for SCS [spinal cord stimulator] consisting of the groups (1) no contraindications, (2) reservations and (3) contraindicated for implant," Plaintiff fell within the "reservations category." Tr. 348. Dr. Drummond indicated that Plaintiff might benefit from a behavioral pain management program. *Id.*

c.  2009

Plaintiff was seen by Dr. Storick on February 11, 2009, for follow-up to discuss Dr. Drummond's evaluation. Tr. 304. Dr. Storick reported the results of the evaluation as follows:

> Dr. Drummond's evaluation indicated severe anxiety, low general activity level related to pain more so than most chronic pain patients, severely high somatoform scores and mild depression. He assigned her to category two which indicates reservations for the device and stated that she might benefit from a behavioral pain management program.

Dr. Storick noted that based on Dr. Drummond's evaluation and Plaintiff's reservations about the spinal cord stimulator, he did not feel it would be in Plaintiff's best interests to pursue the device. *Id.* Dr. Storick released Plaintiff from his care. *Id.*

Plaintiff was seen by M. David Redmond, M.D. of The Center for Pain Management at Palmetto Health Baptist ("Pain Center") on March 3, 2009. Tr. 340-41. After examination, Dr. Redmond recommended Plaintiff "would be a good candidate for participating in the multidisciplinary pain program." Tr. 341. Plaintiff was seen on March 19, 2009, for an office visit. Tr. 353. It was noted that Plaintiff had recently started as a participant in the Full Pain Program. *Id.* Plaintiff returned for an office visit on March 31, 2009, and brought medical records from 2005 that she wanted reviewed to discuss whether she should have neck surgery.

Tr. 352. Upon physical exam by the nurse practitioner it was noted that her neck was "tight and tender to touch." Tr. 352. Plaintiff was given a sample of Fexmid. *Id.* Plaintiff was seen by Dr. Redmond on April 14, 2009, who indicated Plaintiff was completing the pain management program that week. Tr. 351.  Plaintiff stated she was learning to cope with pain, but still complained of lower-back pain with residual sciatica.[3] *Id.* Dr. Redmond prescribed Xanax 1 mg, Restoril 15 mg, gabapentin 600 mg, Cymbalta 30 mg, Cymbalta 60 mg, and Lortab 10/500. *Id.* He also noted Plaintiff would be continuing an exercise program and work with a physical therapist. *Id.*

Medical Consultant James Haynes, MD conducted a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff on June 3, 2009. Tr. 356-63. Dr. Haynes opined that Plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, that she was able to stand and/or walk for at least two hours in an eight-hour workday, and sit for about six hours (with normal breaks) in an eight-hour workday. Tr. 357. Dr. Haynes noted that Plaintiff's was limited in her lower extremities, and limited her ability to push/pull to frequently. *Id.* Dr. Haynes also noted that pain would limit Plaintiff's ability to sustain the full range of medium work. *Id.* Dr. Haynes opined that Plaintiff could frequently climb a ramp or stairs, and could frequently balance; however, she could never climb a ladder, rope, or scaffold. Tr. 358.  Dr. Haynes limited Plaintiff's ability to stoop, kneel, crouch, and to crawl to occasionally. *Id.* Dr. Haynes found no manipulative, visual, or communicative limitations, but noted Plaintiff should avoid concentrated exposure to vibration, and avoid even moderate exposure to hazards such as machinery and

---

[3] Sciatica refers to pain that radiates along the path of the sciatic nerve — which branches from the lower back through the hips and buttocks and down each leg. Typically, sciatica affects only one side of the body. Sciatica most commonly occurs when a herniated disk or a bone spur on the spine compresses part of the nerve. This causes inflammation, pain and often some numbness in the affected leg. *See* http://www.mayoclinic.com/health/sciatica/DS00516 (last visited Dec. 6, 2013).

heights. Tr. 359-60. Regarding the severity of Plaintiff's symptoms and the "alleged effect on function," Dr. Haynes noted the following:

> Symptoms of decreased mobility, limited lifting, and no sitting/standing longer than 30 minutes are partly credible with MDI primarily pain after back operations limiting lumbar flexion, prolonged standing with some antalgic gait. ADL's list eating out at restaurants 1-2/month, grocery shopping weekly, driving a car, daily dish washing and weekly laundering.

Tr. 361.

On June 25, 2009, Consultant Edward Waller, PhD, completed a Psychiatric Review Technique form ("PRTF") assessing Plaintiff. Tr. 364-77. The medical disposition noted a non-severe impairment. Tr. 364. Dr. Waller found Plaintiff had an affective disorder of depression. Tr. 367. Dr. Waller found that under the "B" criteria of the Listings, Plaintiff had mild limitations in Restriction of Activities of Daily Living; in Difficulties in Maintaining Concentration, Persistence, or Pace; and no other limitations. Tr. 374. Dr. Waller noted the evidence did not establish the presence of the "C" criteria. Tr. 375. In his consultant's notes, Dr. Waller's summary concluded: "Credible depression that was not alleged to be disabling and is secondary to chronic back pain. Claimant is able to mentally function at a level that would not preclude the performance of SGA." Tr. 376.

Plaintiff returned to Dr. Redmond at the Pain Center for follow-up on July 10, 2009, "with multiple complaints." Tr. 386. Plaintiff indicated her pain level was seven on a zero-to-ten scale. *Id.* Plaintiff complained of "pain in her mid-to-low back and wonder[ed] whether her hardware [had] shifted." *Id.* Plaintiff also complained of "numbness over the anterolateral aspect of the right thigh." *Id.* Dr. Redmond's impression was that it was likely meralgia paresthetica[4]

---

[4] Meralgia paresthetica is a condition characterized by tingling, numbness and burning pain in the outer part of the thigh. The cause of meralgia paresthetica is compression of the nerve that supplies sensation to the skin surface of the thigh. Tight clothing, obesity or weight gain, and pregnancy are common causes of meralgia paresthetica. However, meralgia paresthetica can also

and encouraged Plaintiff to try to lose weight. *Id.* Dr. Redmond renewed Plaintiff's prescriptions. *Id.* Plaintiff returned to the Pain Center on August 25, 2009, complaining of being unable to sleep and voicing concern about shifting hardware in her back. Tr. 385. Dr. Gunter's office indicated they would not see her without diagnostics, so an x-ray was ordered of Plaintiff's lumbar thoracic spine. *Id.* A follow-up appointment on October 23, 2009, for review of the x-ray showed the results were within normal limits. Tr. 384. Plaintiff complained of a "funny feeling in her back." *Id.* The nurse practitioner indicated possible inflammation and prescribed a Medrol dose pack and possible ultrasound. *Id.* When Plaintiff returned on November 20, 2009, she stated that she got her TENS[5] unit and that it was helping. Tr. 383. Plaintiff indicated that Cymbalta was not helping with her depression anymore, and she wanted to try something else. *Id.* Plaintiff was given Lexapro samples and instructed how to wean herself off the Cymbalta. *Id.*

d.   2010

Plaintiff returned to the Pain Center on January 19, 2010 for routine follow-up. Tr. 382. Plaintiff was distraught over her sister's diagnosis of cancer. *Id.* Plaintiff did not feel that the Lexapro was working and wanted to go back on the Cymbalta. Plaintiff was also given a prescription for Xanax. Plaintiff continued to have pain in her mid to lower back. *Id.* Plaintiff returned for follow-up on February 17, 2010, and indicated the Cymbalta was not helping her depression and she wanted to go back on Zoloft. Tr. 381. The nurse practitioner prescribed Zoloft 50 mg, and made no other changes to Plaintiff's medications. *Id.* Plaintiff returned on April 13, 2010, and reported that her sister's illness "permeat[ed] everything in her life and that

---

be due to local trauma or a disease, such as diabetes. *See* http://www.mayoclinic.com/health/meralgia-paresthetica/DS00914 (last visited Dec. 3, 2013).

[5] TENS, or transcutaneous electrical nerve stimulation, is a back pain treatment that uses low voltage electric current to relieve pain. TENS is typically done with a TENS unit, a small battery-operated device. The device can be hooked to a belt and is connected to two electrodes. The electrodes carry an electric current from the TENS machine to the skin. *See* http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited Dec. 3, 2013).

she [could not] tell the difference between psychological pain and physical pain." Tr. 380. The nurse practitioner increased Plaintiff's prescriptions for Xanax and Zoloft, and gave her a prescription for Phenergan 25 mg after Plaintiff reported feeling nauseous. *Id.* Plaintiff reported her pain level at seven and continued to complain of pain in her mid-to-lower back and some right-sided sciatica. *Id.* Plaintiff was seen on May 11, 2010 for routine follow-up. Tr. 379. Plaintiff reported pain at level seven and complained of pain in the lumbar spine. *Id.* No changes were made to Plaintiff's medications. *Id.* When Plaintiff returned on June 16, 2010, she reported a pain level of six. Tr. 398. Plaintiff continued to use her TENS unit and noted her pain was "under fairly decent control with her current medications." *Id.* No changes were made to Plaintiff's medications. *Id.*

Medical Consultant Elva Stinson, MD conducted a Physical RFC Assessment of Plaintiff on July 13, 2010. Tr. 417-24. Dr. Stinson opined that Plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, that she was able to stand and/or walk, and sit for about six hours (with normal breaks) in an eight-hour workday. Tr. 418. Dr. Stinson noted that Plaintiff's was limited in her lower extremities in her ability to push and/or pull. *Id.* Dr. Stinson noted Plaintiff's family stress was exacerbating her symptoms. *Id.* Dr. Stinson opined that Plaintiff could occasionally climb a ramp or stairs, but she could never climb a ladder, rope, or scaffold. Tr. 419. Dr. Stinson opined that Plaintiff could frequently balance, but he limited Plaintiff's ability to stoop, kneel, crouch, and to crawl to occasionally. *Id.* Dr. Stinson found no manipulative, visual, or communicative limitations, and no environmental limitations other than Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. Tr. 420-21. Regarding the severity of Plaintiff's symptoms and the "alleged effect on function," Dr. Stinson noted the following: "[Symptoms] are partially credible. [Claimant] limits all ADLs because of

11

pain. Does all personal care and some light [household] chores. Able to drive and shop on limited basis. Objective findings w/ normal neuro, limited motion by pain." Tr. 422.

Plaintiff returned to the Pain Center on August 10, 2010, for routine follow-up and brought in a questionnaire for her Social Security disability hearing. Tr. 442. Dr. Redmond stated Plaintiff needed an FCE, but would review the one she had done elsewhere. *Id.* Plaintiff's pain level was at five and she continued to use the TENS. She did not feel the Zoloft was controlling her depression and asked to go back on the Cymbalta. *Id.* She was given samples of Cymbalta 60 mg. *Id.*

Dr. Redmond completed an Impairment Questionnaire on August 24, 2010, referencing Plaintiff's FCE of May 8, 2008. Tr. 427-29. Dr. Redmond opined that Plaintiff could sit, stand/walk for less than two hours in an eight-hour work day, could walk one city block without rest or severe pain, could sit for one hour before needing to get up, and could stand for 20 minutes before needing to sit down or walk around. Tr. 427. Dr. Redmond noted Plaintiff could rarely twist, stoop, or climb ladders; could never crouch or squat, and could occasionally climb stairs. Tr. 428. He noted she could frequently lift and carry ten pounds or less, occasionally lift and carry 20 pounds, and never lift or carry 50 pounds. *Id.* Dr. Redmond opined that Plaintiff's pain would frequently interfere with her attention and concentration, and she would likely miss three days per month from work as a result of her impairments or treatment. *Id.* Dr. Redmond noted that he did not believe Plaintiff could perform normal work activities on a sustained basis that would require her to stand, walk, or sit for six hours out of an eight-hour day. Tr. 428-29. He opined that Plaintiff's physical impairments alone were disabling and would prevent her from sustained employment. Tr. 429.

Plaintiff was seen for follow-up at the Pain Center on October 5, 2010. Tr. 443. Plaintiff indicated the increase in the Cymbalta to 90 mg was helpful. *Id.* Plaintiff reported her pain level was at six, she continued to use the TENS unit, and she had pain in her lumbar spine but no right-sided sciatica. *Id.* The nurse practitioner indicated she was pleased with how Plaintiff was doing and continued Plaintiff on her current prescriptions. *Id.*   When Plaintiff returned on November 30, 2010, she reported her pain level was at five. Tr. 444. There was no change in Plaintiff's lumbar pain with residual right-sided sciatica, and the nurse practitioner made no changes to Plaintiff's medications. *Id.*

### e.  2011

Plaintiff was seen by the nurse practitioner at the Pain Center for a routine follow-up appointment on January 25, 2011. Tr. 445.  Plaintiff reported a pain level of six and indicated she did not feel like she was "getting good pain relief at all any more." *Id.*  The nurse practitioner discussed with Dr. Redmond whether Plaintiff might benefit from an LESI (lumbar epidural steroid injection), and one was scheduled. *Id.*  Dr. Redmond performed the LESI on Plaintiff on February 8, 2011. Tr. 446.

Plaintiff returned for follow-up on March 22, 2011, and stated her pain level was a seven. Tr. 448.  Plaintiff indicated the Lortab was not helping, and Plaintiff was started on OxyContin 10 mg every 12 hours, with Lortab as needed for breakthrough pain. *Id.*

### C.  The Administrative Proceedings

#### a.  Plaintiff's Testimony

At Plaintiff's July 6, 2011, hearing, she confirmed that she was born on January 9, 1964, and at the time of the hearing was 47 years old. Tr. 31.  Plaintiff stated that she was married, and

had completed high school. *Id.* Plaintiff's past relevant work ("PRW") was as a manager of a convenience store, a job she performed from 1996 until 2006. Tr. 35.

In response to questions posed by her counsel, Plaintiff testified that as a result of her back injury she is unable to stand for long periods of time, and at the most she could stand for one hour before it would become painful. Tr. 42. She testified that she could not sit for more than an hour before she would need to get up and change positions, and she "could probably walk halfway around a block." Tr. 43-44. Plaintiff testified that she had a valid driver's license but only drove less than five miles. Tr. 45. For longer distances either her husband or mother would drive her. *Id.* Plaintiff testified that she has pain in her back on a daily basis, and does not have pain for "[m]aybe four hours a day." Tr. 52. Plaintiff stated that the medications she takes affect her memory and concentration. Tr. 53-55. Plaintiff testified that she can wash dishes do laundry with assistance. Tr. 58. Plaintiff stated that because of her back she would be unable to do a job that required her to stand or to sit for six hours out of a day. Tr. 59.

b.   Vocational Expert ("VE") Testimony

VE Carroll Hart Crawford characterized Plaintiff's past work as a convenience store manager as "light and skilled work, with an SVP:7." Tr. 60. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who was "limited to performing work with restrictions that require no lifting or carrying over 20 pounds occasionally and 10 pounds frequently, no standing and/or walking over two hours total in an eight-hour workday. . . .there would be only occasional stooping, twisting, crouching, kneeling, crawling and climbing of stairs or ramps; no climbing of ladders or scaffolds; only occasional foot pedals or other controls with the right lower extremity; and, . . . the avoidance of hazards such as unprotected heights, vibration and dangerous machinery." Tr. 61. When asked whether such an

individual could perform Plaintiff's PRW, the VE testified they would not. *Id.* When asked whether there would be any transferable skills, the VE testified that transferable skills would include "dealing with people in a supervisory role, the responsibility working independently and handling the financial transactions." *Id.* The ALJ asked what jobs would be available for the hypothetical individual utilizing transferable skills acquired by the Plaintiff. *Id.* Based on the two-hour standing restriction, the VE identified the following sedentary, semi-skilled jobs: industrial order clerk, SVP:4, DOT number 221.367-022, 1,800 jobs in South Carolina, 159,000 nationwide; and material lister, SVP:4, DOT number 229.387-010, 1,400 jobs in South Carolina, 98,000 nationally. Tr. 62. The VE testified there was no conflict between the skill and exertion requirements of the cited jobs and the jobs as described in the DOT. *Id.*

Referencing Dr. Redmond's impairment questionnaire responses, Plaintiff's counsel asked the VE what the impact would be if the hypothetical were changed to incorporate both a two-hour sitting restriction and standing restriction. Tr. 63-64. The VE responded that it would indicate less than the full range of sedentary work, to which no regular full-time work would be available. Tr. 64. When asked what would be the effect on employability if Plaintiff had to be absent from work three days per month, or if pain or symptoms interfered with attention and concentration needed to perform simple tasks, the VE testified there would be no full-time work. Tr. 64-65.

## II.  Discussion

### A.  The ALJ's Findings

In his August 10, 2011, decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since November 4, 2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.    The claimant has the following severe impairment: status post multiple lumbar surgeries with residual radiculopathy in the right lower extremity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for work requiring lifting or carrying of more than 20 pounds, more than occasional lifting or carrying of 11 to 20 pounds, lifting or carrying of 10 pounds or less more than frequently, standing or walking for more than 2 hours in an 8 hour workday, climbing of ladders or scaffolds, exposure to unprotected heights or dangerous machinery, or more than occasional stooping, twisting, crouching, kneeling, crawling, climbing of stairs or ramps, or operation of foot pedals or controls with the right lower extremity.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on January 9, 1964 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, the claimant

has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 4, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15-23.

B.  Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW; and (5)

---

[6]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess

17

whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that

---

whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

> 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*,  *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.  Analysis

Plaintiff asserts that the ALJ failed to give appropriate controlling weight to the opinion of Plaintiff's treating physician.  Plaintiff alleges that the determinative issue is "whether or not the Plaintiff's residual functional capacity mandated a finding that she was disabled." Pl.'s Br. 3, ECF No. 16.  The Commissioner argues that the ALJ "reasonably discounted Dr. Redmond's checkbox opinion," and "Dr. Redmond's extreme opinion was inconsistent with the other evidence of record, including his own treatment records." Def.'s Br. 10-11, ECF No. 17.

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]"  *See also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).

The Social Security Administration typically accords greater weight to the opinion of a claimant's treating medical sources, because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the

record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654; 20

C.F.R. § 404.1527(d).   Treating source medical opinions are entitled to deference and must be

weighed using all of the factors provided in 20 C.F.R. § 404.1527 and § 416.927. In many cases,

a treating source's medical opinion will be entitled to the greatest weight and should be adopted,

even if it does not meet the test for controlling weight. In reviewing the ALJ's treatment of Dr.

Redmond, the court is focused on whether the ALJ's opinion is supported by substantial

evidence. The court is not to "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at

589.

The ALJ considered the opinion of Dr. Redmond and accorded it "some, but not full,

weight." Tr. 20.  He found Dr. Redmond's opinion was not persuasive because it was "not

supported by his own progress notes and [was] inconsistent with other substantial evidence

including treating and non-examining physicians." *Id.* (noting state agency medical consultants'

opinions were consistent with medical records indicating Plaintiff retained the RFC to perform

work at light exertional level). Dr. Redmond treated Plaintiff for pain management at the

Palmetto Health Baptist Center for Pain Management. Tr. 340. Treatment records from March

2009 through March 2011 indicate Plaintiff continued to complain of lower-back pain with

residual sciatica, and she was treated with pain medications, implantation of a TENS unit, and

steroid injections with little relief. Tr. 340-41, 351-52, 379-86, 398, 442-48. In August 2010, Dr.

Redmond completed an impairment questionnaire based on a 2008 FCE. The 2008 FCE

indicated Plaintiff had a "self-reported sitting and static standing tolerance of 60 and 20

minutes." Tr. 225.  Dr. Redmond's opinion indicated Plaintiff could sit, stand, and walk for less

than two hours in an eight-hour work day, and Plaintiff could sit for one hour before needing to

get up. Tr. 427. Two state agency medical consultants reviewed Plaintiff's records to conduct physical RFC assessments.  In June 2009, Dr. Haynes indicated Plaintiff could stand and/or walk for two hours, and sit for six hours with normal breaks in an eight-hour workday. Tr. 357. Dr. Haynes noted that Plaintiff's symptoms of "no sitting/standing longer than 30 minutes are partly credible." Tr. 361.  In July 2010, Dr. Stinson opined Plaintiff could stand, walk, and sit for six hours in an eight-hour workday. Tr. 418. The medical consultants offer no specific evidentiary support for their opinions regarding Plaintiff's ability to sit for six hours. The ALJ found the opinions of the medical consultants were "consistent with the medical records and are given considerable, but not controlling weight." Tr. 20.

As noted in *Brown v. Astrue*, when faced with conflicting evidence such as this, an ALJ is to weigh the opinions of a claimant's treating physicians pursuant to "'all of the factors' set forth in § 1527(c)." *Brown v. Astrue*, C/A No. 2:11-2085-RMG, 2013 WL 214163, at *4 (D.S.C. Jan. 18, 2013). Such review includes generally giving "more weight to opinions of examining and treating physicians, particularly where there has been a lengthy physician-patient relationship. 20 C.F.R § 1527(c)(1), (2)." *Id.* The ALJ is also to consider whether the treating physician is a specialist, "the consistency of his opinions, and the support found for his opinions in the record, particularly 'medical signs and laboratory findings.'" *Id.* (quoting § 1527(c)(3)-(5)).

In *Brown*, the court noted that the ALJ had given greater weight to the opinions of the state agency consultants ("chart reviewers") than to the claimant's treating specialist physician. *Id.* The court noted the ALJ did not address the "narrow differences that actually existed between the chart reviewers and the treating physicians" or the chart reviewers' failure to provide "any specific justification" for their "more generous assessment" of claimant's functional capacity. *Id.*

The court reversed and remanded the decision for further agency consideration and offered the following instruction to the ALJ on remand:

> Further, in reviewing the weight to be given to the chart reviewers, the ALJ should remember that he should generally "give more weight to the opinion of a source who has examined [the claimant] than the opinion of a source who has not examined [the claimant]" and "the more knowledge a treating source has about [the claimant's] impairment(s) the more weight [the ALJ is expected] give to the source's medical opinion."

*Brown,* 2013 WL 214163, at *4 (quoting 20 C.F.R. § 1527(c)(1), (c)(2)(h) (alterations in original)).

These instructions should be heeded by the Commissioner upon remand of the instant matter. Here, in making his RFC determination, the ALJ found that Plaintiff could not stand or walk for more than two hours in an eight-hour workday, but he offered no finding with regard to Plaintiff's ability to sit. Tr. 19. Plaintiff alleges that when posing his hypothetical to the VE, the ALJ "artfully included the restriction noted by [ ] Dr. Redmond regarding standing, but carefully left out the specific sitting restriction noted by that same doctor." Pl.'s Reply Br. 2, ECF No. 18. Plaintiff argues that had the restriction on sitting been included, the VE would have concluded that Plaintiff was limited to less than sedentary work. *Id.* at 3. Indeed, when asked in a follow-up question the impact of a two-hour standing and sitting restriction, the VE responded that no regular full-time work would be available. Tr. 64. The Commissioner asserts that "even if the evidence was rationally susceptible to the interpretation Plaintiff endorses, the ALJ, as finder of fact, bears the ultimate responsibility of weighing the evidence and resolving evidentiary conflicts." Def.'s Br. 14. The Commissioner argues that the ALJ's determination is legally sound and supported by substantial evidence, therefore the court cannot reweigh the evidence or substitute its own judgment. *Id.*

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). However, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Here, the undersigned is unable to determine whether substantial evidence supports the ALJ's RFC determination—especially because the ALJ does not include a finding with regard to a limitation on sitting, nor does the ALJ analyze Dr. Redmond's opinion under the factors set forth in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Although the ALJ discussed Dr. Redmond's treatment of Plaintiff in Step Two of his evaluation, in making his RFC determination the ALJ made no reference to Dr. Redmond's long treatment history with Plaintiff, his knowledge of her medical condition, the consistency of his findings, or his specialized knowledge with regard to Plaintiff's pain symptoms. The ALJ did not address the differences between the opinions of Dr. Redmond and the medical consultants, or how their opinions were consistent with the medical records and why Dr. Redmond's were not.

Plaintiff argues that a remand for further development of the record would serve no useful purpose, and instead the court should enter an order finding "Plaintiff was disabled as of no later than June 8, 2007, because her [RFC] was less than sedentary, and direct the Commissioner to award benefits based on that disability determination." Pl.'s Br. 10. The Commissioner asserts that such an order would "encroach upon the Commissioner's role as fact-finder." Def.'s Br. 14. The undersigned agrees with the Commissioner. Accordingly, the

undersigned recommends this matter be remanded for further evaluation of Plaintiff's RFC, including Dr. Redmond's opinion, in accordance with this Report.

III. Conclusion and Recommendation

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.

December 12, 2013                              Kaymani D. West
Florence, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**